THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MARK KROLL, Defendant-Appellant.

(No. 53639;

First District—February 25, 1972.

*Rehearing denied March 28, 1972.*

Harry J. Busch and Warren D. Wolfson, both of Chicago, for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle, Alan M. Polikoff, and Stephen J. Connolly, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

Defendant appeals from a conviction for conspiracy to commit theft for which he was sentenced to a term of one to three years. He was tried without a jury.

On appeal defendant contends: (1) that the judge based his findings on matters not in evidence thus depriving defendant of his rights to confrontation and due process of law; (2) that defendant's right to remain silent was violated by improper remarks of the prosecution and evidenced by the oral opinion of the trial judge; (3) that the court erred when it failed to strike the direct testimony of two State witnesses upon

defendant's motion, after defendant learned that their grand jury testimony had not been recorded; (4) that the court erred in failing to order the production of the grand jury testimony of two persons who did not testify at trial; and (5) that defendant was not proven guilty beyond a reasonable doubt.

The record in this case is voluminous; over 5000 pages of testimony were recorded and hundreds of exhibits were introduced. Defendant was tried on 24 counts of theft and three counts of conspiracy to commit theft. At the end of the State's case in chief, the 24 substantive counts were dismissed; the court denied defendant's motion to dismiss the remaining conspiracy counts. At the close of all the evidence, the court found defendant guilty of the conspiracy.

Both parties agree that the State's case lay essentially in the testimony of three witnesses, Raymond Wernke, William Jones and Harold Peck [1] and the extensive documentation inferentially supporting the conspiracy theory. The defense relied on an extensive cross-examination of the three State witnesses and the testimony of its only witness, Thomas Harris.

The State's theory of the case is that the defendant, through the use of a web of corporate entities, was the instrumental figure in draining a substantial amount of funds from Oxford General Insurance Company, an Illinois corporation. Defendant was not an officer of Oxford General. He was not authorized to sign checks on its behalf, nor did he in fact do so. Rather, he directed this draining process indirectly, through the figures of Raymond Wernke, Harold Peck and William Jones.

The defense's theory of the case is that the defendant was simply not connected to the process by which Oxford General was victimized. It contends that the three key State witnesses were the real perpetrators of this crime and that they were now trying to shift the blame onto the defendant.

There were three conspiracy counts in the indictment differing from each other only with respect to the location where the alleged agreement to commit theft and acts pursuant thereto took place. They each stated that defendant and Harold Peck committed the offense of conspiracy in that they:

"[w]ith intent that the offense of theft of property, money, funds, bank credits, bank deposits, checks * * * and securities, of a value of more than one hundred fifty dollars, the property of that certain aforesaid mutual insurance company duly organized, incorporated and existing under and pursuant to the terms of the Illinois Insurance Code

---

[1] Peck was indicted along with defendant but a motion for severance was granted.

and having the names, successively, of Columbia General Mutual Casualty Company and Oxford General Mutual Insurance Company, be committed, agreed with each other to the commission of that offense, and in furtherance of said conspiracy they committed certain acts, including, but without limitation to, the following: [The first three overt acts are omitted.]

(4) On or about March 13, 1963, Mark Kroll and Harold Peck, and each of them, caused and directed the transfer, by means of a check and order for the Payment of money, of money, funds and credits, in the amount and of the value of $55,000.00, the property of said mutual insurance company, on deposit at the American National Bank and Trust Company of Chicago, in said County, to the Central Trust Company, a banking institution in Cincinnati, Ohio.

(5) On or about May 21, 1963, Mark Kroll and Harold Peck, and each of them, caused and directed the transfer, by means of a check and order for the payment of money, of money, funds and credits, in the amount and of the value of $16,000.00, the property of said mutual insurance company, on deposit at the American National Bank and Trust Company of Chicago, in said County, to Oxford Financial Corporation, a corporation.

(6) On or about June 10, 1963, Mark Kroll and Harold Peck, and each of them, caused and directed the transfer, in said County, by means of a check and order for the payment of money, of money, funds, and credits, in the amount and of the value of $2,000.00, the property of said mutual insurance company, on deposit at the American National Bank and Trust Company of Chicago, in said County, to an individual payee located in the City of Chicago, in said County.

(7) On or about August 26, 1963, Mark Kroll and Harold Peck, and each of them, caused and directed the transfer, by means of a check and order for the payment of money, of money, funds and credits, in the amount and of the value of $750.00, the property of said mutual insurance company, on deposit at the American National Bank and Trust Company of Chicago, in said county, to said Oxford Financial Corporation.

(8) On or about August 30, 1963, Mark Kroll and Harold Peck, and each of them, caused and directed the transfer, by means of a check and order for the payment of money, of money, funds and credits, in the amount and of the value of $1,000.00, the property of said mutual insurance company, on deposit at the American National Bank and Trust Company of Chicago, in said County, to Agency Management Corporation, a corporation.

(9) On or about September 27, 1963, Mark Kroll and Harold Peck

and each of them, caused and directed the transfer, by means of a check and order for the payment of money, of money, funds and credits, in the amount and of the value of $11,300.00, the property of said mutual insurance company, on deposit at the American National Bank and Trust Company of Chicago, in said County, to North American Securities Company, Inc., a corporation."

OPINION

Defendant first contends that the judge based his decision on matters not in evidence thus depriving defendant of his rights to confrontation and due process of law. Specifically, defendant argues that the court concluded that the defense's only witness, Thomas Harris, was biased, and that this conclusion was based on various findings of fact which were unsubstantiated by competent evidence in the record.

We find it unnecessary to consider whether Harris was or was not a credible witness since the trial court found that Harris "did not and could not testify to any of the overt acts alleged in the conspiracy counts, in Paragraphs Number 4 through 9, * * *." We might also add that Harris did not and could not testify as to either the many business office meetings at which the agreement to commit theft was arrived at or the extensive documentation inferentially supporting the conspiracy theory since he was in Florida operating North American Underwriters, a Florida based insurance company, and the victimization of Oxford General took place essentially in Chicago and Cincinnati, the latter city being the location of the corporate offices of Oxford General and the other corporate entities involved.

■■ Since proof of only one overt act in carrying out the conspiracy is necessary to support the conviction,[2] we will specifically analyze paragraph six of each conspiracy count. It in substance alleges that the defendant and/or Harold Peck caused $2000 to be transferred by check from Oxford General's bank account to "an individual payee in Chicago." At the trial the named payee, a prominent Chicago based attorney, testified that a company owned by the defendant (Twentieth Century Underwriters) had incurred a tax liability which could be settled for $2000. The three State's witnesses all corroborated the fact that the defendant owed a tax assessment and that this particular Chicago at-

---

[2] Section 8—2(a) of the Code of Criminal Procedure, Ill. Rev. Stat. 1965, par. 8—2(a), reads as follows:

"(a) Elements of the offense.

A person commits conspiracy when, with intent that an offense be committed, he agrees with another to the commission of that offense. No person may be convicted of conspiracy to commit an offense unless *an act* in furtherance of such agreement is alleged and proved to have been committed by him or by a co-conspirator." (Emphasis supplied.)

torney was representing him in the matter. Jones stated that on June 10, 1963, acting on the defendant's instructions, he issued a check from Oxford General payable to the named attorney; said check was admitted into evidence as People's Exhibit 15. The attorney testified that he had never performed legal services on behalf of Oxford General and that Oxford General owed him nothing. He simply accepted the check for his attorney's fees in settling the tax liability defendant had incurred in the operation of Twentieth Century Underwriters.

Five additional checks, for $200 each, were paid to this attorney out of Oxford General's funds. They were for services rendered for the defendant concerning matters wholly unrelated to the operation of Oxford General. Peck, Wernke and Jones knew that the checks were not issued for services rendered on behalf of Oxford General but nevertheless acquiesced in defendant's instructions. Jones ultimately drew these five checks and they were admitted as People's Exhibits 13, 16, 17, 18 and 24.

■■ As previously noted, Harris did not testify at all as to the above facts, nor as to any of the other overt acts contained in paragraphs 4 through 9 of the conspiracy counts. Therefore, even if the trial judge erred in stating his reasons for finding Harris a biased witness, this error had no significance and did not result in prejudice to the defendant.

Defendant's second contention is that his constitutional and statutory rights (Ill. Rev. Stat. 1967, ch. 38, par. 155—1) to remain silent were violated by improper remarks of the prosecution and evidenced by the opinion of the trial judge. Defendant points to the following instances where alleged improper comments were made.

During the direct examination of Thomas Harris, the defenses witness, Harris was asked to relate the substance of a telephone conversation between himself and the defendant. The State objected to Harris testifying as to what the defendant said during the conversation, arguing that such testimony would be hearsay. The State's Attorney argued to the court:

"Your honor, we cannot cross examine the conversation being attempted to be put in on behalf of the Defendant, it's self serving; if the Defendant wants to take the stand and testify to it that is another thing."

The defense moved that this remark be stricken from the record. The court denied the motion. Defendant then moved for a mistrial, and this motion was also denied. The court overruled the State's evidentiary objection and Harris was permitted to testify as to what the defendant said during the subject telephone conversation. Later the defense renewed its motion for a mistrial. The State reiterated the substance of its objection to Harris' testimony.

■■ The record shows that the purpose of the prosecutor's remarks was to explain the nature of his evidentiary objection. His argument was that the admission of statements made by the defendant during the telephone conversation would be hearsay if testified to by the witness on the stand and introduced to establish the truth of the statements. The reference to the fact that only the defendant could properly testify as to what he had said during the conversation was only a further explanation of the nature of the objection. We find his comments to be proper argumentative responses, not comments purposely attracting the court's attention to the defendant's failure to testify. See *People v. Wood,* 306 Ill. 224, 230, 231, 137 N.E. 799; see also *People v. Woods,* 26 Ill.2d 557, 562, 188 N.E.2d 1.

■■ The other incident pointed to by the defendant also occurred during the cross-examination of Thomas Harris. The State was attempting to show that Harris lived in a home owned by the defendant. Harris was asked, "If [the defendant] were to state that he or his wife owned Calico Farms, would that be a true statement?" In a colloquy with the court, defense counsel stated:

"[This is] another oblique reference to [the defendant] testifying, [the defendant] saying. No place for this in this trial."

Defendant's objection to the question was sustained. We do not find this "oblique reference" to be prejudicial. The inference defendant would have us draw is too weak to conclude that the question was asked with the intent to direct the attention of the trier of fact to defendant's failure to testify. See *People v. Mills,* 40 Ill.2d 4, 237 N.E.2d 697.

The defendant calls attention to the court's opinion which states:

"The only person who could have testified about [the overt acts alleged in the indictment] * * * has been in this courtroom since the trial began."

However, the court added:

"Despite the fact that the court has reason to conclude that he is a courtroom veteran, he did not take the stand. *This was his choice, and the court, of course, does not hold it against him."* (Emphasis supplied.)

Defendant argues, "[t]hat the Court really did hold it against him is made plain in the final paragraph of * * * [the court's] opinion" where the court stated:

"The evidence of bias and interest on the part of Harris *plus the defense's failure to present denial testimony, which only it could offer,* leads this Court to the conclusion that it must resolve the issues in this case in favor of the prosecution." (Emphasis supplied.)

■■ We believe that the court was merely commenting on the un-

contradicted nature of the State's case. It is well settled that a prosecutor may comment on the uncontradicted nature of the State's case even where the only person who could have contradicted the State's evidence was the defendant himself. (*People v. Mills* (1968), 40 Ill.2d 4, 8, 237 N.E.2d 697; *People v. Hall,* Ill.App. First District No. 54375.) We discern no prejudicial effect from the court making a similar comment.

Defendant's third contention is that the court erred when it failed to strike the direct testimony of two State witnesses (Raymond Wernke and William Jones) upon defendant's motion, after defendant learned that their grand jury testimony had not been recorded.

In all, 25 persons testified before the grand jury. The testimony of 14 persons was transcribed. No court reporter was present during the testimony of six court reporters, three Assistant State's Attorneys and two State witnesses, Raymond Wernke and William Jones. Defendant argues that the prosecution strategically "picked and chose" those persons who were to have their grand jury testimony transcribed. In his brief defendant states, "It is not unreasonable to conclude the prosecutors were making a conscious effort to insulate their prize witnesses from effective cross-examination."

The State's Attorney in a colloquy with the court stated that no "ulterior motive" was present, that it was the practice of the State's Attorney's office to transcribe only the testimony of those witnesses who it feared might prove unreliable. Also, he stated that the instant case "was handled by the Financial Crimes Section and it is not the common practice to have a court reporter present at all times on special cases."

■■■ In *People v. Colletti,* 101 Ill.App.2d 51, 242 N.E.2d 63, *cert.* den. 396 U.S. 927, this precise issue was decided adversely to the defendant. In *Colletti* the defendant made a timely motion for the production of the grand jury testimony of various witnesses. It was learned that no court reporter had been present at the grand jury proceeding. In reviewing the claim that this procedure had denied the defendants a fair trial, the Appellate Court accepted the defendants' assumption that the sole reason for this practice was "to deprive [the] defendants of an opportunity to have access to grand jury testimony for impeachment purposes." The court stated at page 58:

"The basic question is whether the State has a duty to insure that the testimony of witnesses before the Grand Jury will be recorded for the later use of the defendant. It is clear that no such duty exists. *People v. Aughinbaugh,* 36 Ill.2d 320, 324-325, 223 N.E.2d 117 (1967). Accordingly, it makes no difference what the motive of the State's Attorney was in not having the testimony recorded.

The theory advanced by the defendants would create impossible problems of administration, * * *. Every time the State called a witness whose Grand Jury testimony had not been recorded, an inquiry would have to be held as to the 'motive' of the prosecutor in not having had a reporter present."
See also *People v. Derengowski*, 67 Ill.App.2d 66, 213 N.E.2d 618.

Defendant next contends that the court erred in failing to order the production of the grand jury testimony of two persons who did not testify at the trial. The names Leo Spivack and Robert Heffner were mentioned at various times during the trial as being business confidants of Harold Peck. Spivack was a Chicago lawyer who did work for Peck. Heffner was the president of Guaranty Financial Corporation, the corporate vehicle used to purchase Oxford General. Both men testified before the grand jury. Their testimony was transcribed. After the State presented its case in chief, defendant moved for the production of Spivack's and Heffner's grand jury testimony. This motion was denied. Defendant contends that this was error.

■■ We believe that *People v. French*, 61 Ill.App.2d 439, 209 N.E.2d 505, is dispositive of this issue. In *French* the defendant, before trial, moved for the production of the grand jury testimony of a particular witness. In the motion defendant stated that this testimony was vital to his case and necessary for the proper preparation of his defense. The court granted the motion. The State's Attorney refused to produce the transcript until the particular witness testified at trial, stating that it would then be made available to the defendant for impeachment purposes. The State's Attorney was held in contempt. In reversing the contempt order the court stated at page 445:

"Here the witness whose testimony is sought, has not yet testified. He has not yet stated before the defendant and the world all that he supposedly knows about the commission of the crime in question. Until he does so testify, *no matter how vital his knowledge may appear, there can be no certainty that he will testify.* * * * *Until a witness speaks on the stand at the trial, his prior utterances before the grand jury should remain undisclosed unless he chooses, himself, to disclose what he has said, or unless there are compelling circumstances, not present in the case at bar, which may dictate, in the furtherance of justice, that a disclosure be made.* * * * It is important if the grand jury is to serve its function, that these witnesses be heard. It is obvious that the guarantee, that one will not later be called upon to testify publicly, serves no purpose if the defendant can obtain this same grand jury testimony prior to trial, by merely requesting it for the purpose of preparation for trial." (Emphasis supplied.)

See *People v. Hall*, 83 Ill.App.2d 402, 227 N.E.2d 773; *People v. Allen*, Ill.Sup. No. 41441.

In an effort to circumvent the holding in *People v. French, supra*, defendant argues that "there was a great likelihood" that the testimony of Spivack and Heffner was favorable to the defendant and therefore the court should have ordered said testimony turned over to the defendant pursuant to Section 112—6(b) of the Code of Criminal Procedure, Ill. Rev. Stat. 1967, ch. 38, par. 112—6(b). This section provides in relevant part:

"Matters occurring before the Grand Jury other than the deliberations and vote of any grand juror may be disclosed when the court, preliminary to or in connection with a judicial proceeding, directs such in the interests of justice."

■■ In essence the defendant is arguing that the State knowingly suppressed information favorable to the defendant. (See *Brady v. Maryland*, 373 U.S. 83, 87.) He does this without giving any indication that Spivack or Heffner were persons unknown or inaccessible to him. (See *People v. Smith*, 46 Ill.2d 430, 433, 263 N.E.2d 860.) It is obvious from the record that the defendant was aware of both Spivack's and Heffner's existence well before trial. In his motion for the production of grand jury testimony, made three and one-half months before the trial, defendant listed the names of Spivack and Heffner. The names and addresses of both men were on the list of potential State witnesses furnished by the State before trial. There was no showing that defendant made any effort to have these men testify on his behalf. Under these circumstances it cannot be said that the interests of justice required the production of their grand jury testimony. See *People v. Bivens*, 123 Ill.App.2d 79, 85, 259 N.E.2d 607.

■■ Defendant's final contention is that he was not proven guilty beyond a reasonable doubt. Defendant's main argument here is that the trial court could not rationally direct a verdict for the defendant (as it did) on the substantive theft counts and then find him guilty of conspiracy to commit theft. In its reply brief defendant states that, "The dates and transactions contained in the substantive counts are not rationally separable from those in the three conspiracy counts." We think this argument is without merit. The substantive counts charged defendant with exerting unauthorized control over the funds of Oxford General. The conspiracy counts stated that there was an agreement between defendant and Harold Peck to exert unauthorized control over said funds and that various specific acts were performed in furtherance of that agreement. See Ill. Rev. Stat. 1965, ch. 38, par. 8—2.[3]

---

[3] See Note 2, *supra*.

None of these acts was performed by defendant. Rather, Harold Peck, defendant's co-conspirator, and the president of Oxford General, was the person overseeing their performance. Under these circumstances the court could rationally find that as a matter of law defendant had not committed the offense of theft (since he personally did not exert unauthorized control over the subject funds) but that he had committed the offense of conspiracy to commit theft in that he had agreed to commit said offense and that his co-conspirator, Peck, had performed acts in furtherance thereof.

The State presented credible and incriminating testimony through the figures of Raymond Wernke, William Jones and Harold Peck. Their testimony was corroborated by an extensive array of documentary evidence. The defense presented no substantial evidence to contradict the State's case. We do not find the trial court's decision so unreasonable as to require reversal. See *People v. Watkins*, 46 Ill.2d 273, 263 N.E.2d 115.

The decision of the circuit court is affirmed.

Judgment affirmed.

LORENZ, P. J., and ENGLISH, J., concur.